# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF ALASKA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF LOUISIANA, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW HAMPSHIRE, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF RHODE ISLAND, STATE OF TENNESSEE, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA, STATE OF WISCONSIN, and DISTRICT OF COLUMBIA, *ex rel*. BRYAN TICER, Plaintiffs, v. OPTUM, INC., OPTUMRX, INC., UNITEDHEALTH GROUP, INC., CIGNA CORPORATION, and, CIGNA HEALTH AND LIFE INSURANCE COMPANY, Defendants. | NO. CIV-19-122-R _____ <br><br> **COMPLAINT PURSUANT TO FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.*, AND PENDENT STATE FALSE CLAIMS ACTS** <br><br> **FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** <br><br> **NOT FOR PUBLIC DISCLOSURE DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Bryan Ticer, on behalf of the United States, the State of Alaska, the State of

California, the State of  Colorado, the State of Connecticut, the State of Delaware, the State of

Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the

1

State of Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of
Michigan, the State of Minnesota, the State of Montana, the State of Nevada, the State of New
Jersey, the State of New Mexico, the State of New Hampshire, the State of New York, the State
of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the
State of Texas, the Commonwealth of Virginia, the State of Wisconsin and the District of
Columbia (collectively "the States" or "the Plaintiff States"), brings this action for violations of
the federal False Claims Act, 31 U.S.C. §§3729 *et seq.* ("False Claims Act" or "FCA"), as well
as for violations of the following state false claims acts: The Alaska Medical Assistance False
Claims Reporting Act, Ak Stat § 09.58.010 *et seq*; The California False Claims Act, Cal. Gov't
Code §§12650 *et seq.*; The Colorado Medicaid False Claims Act, 25.5-4-304-25.5-4-310; The
Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; The District of Columbia False
Claims Act, D.C. Code Ann. §§2-308.03 *et seq.*; The Delaware False Claims and Reporting Act,
Del. Code Ann. tit. 6, §§1201 *et seq.*; The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*;
The Georgia False Medicaid Claims Act, Ga. Code Ann. §§49-4-168 *et seq.*; The Hawaii False
Claims Act, Haw. Rev. Stat. §§661-21 *et seq.*; The Illinois Whistleblower Reward and Protection
Act, 740 Ill. Comp. Stat. Ann. §§175/1 *et seq.*; The Indiana False Claims and Whistleblower
Protection Act, Indiana Code §5-11-5.5; The Louisiana Medical Assistance Programs Integrity
Law, La. R.S. 46:437.1 *et seq.*; The Maryland False Health Claims Act of 2010, Md. Code Ann.
§ 2-602 *et seq.*; The Massachusetts False Claims Act, Mass. Ann. Laws. Ch. 12, §§5A *et seq.*;
The Michigan Medicaid False Claims Act, MCLS §§400.601 *et seq.*; The Minnesota False
Claims Act, Minn. Stat. § 15C.01 *et seq.*; The Montana False Claims Act, Mont. Code Anno.
§§17-8-401 *et seq.*; The Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; The New
Hampshire False Claims Act, RSA tit. XII, Ch. 167: 61-b; The New Jersey False Claims Act,
N.J. Stat. §2A:32C-1 *et seq.*; The New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann.

2

§27-2F-4 *et seq.*; The New York False Claims Act, NY CLS St. Fin. §§187 *et seq.*; The North

Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§1-605 *et seq.*; The Oklahoma Medicaid

False Claims Act, Okla. Stat. tit. 63, §§5053 *et seq.*; The Rhode Island False Claims Act, R.I.

Gen. Laws §§9-1.1-1 *et seq.*; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§

71-5-171 *et seq.*; The Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 *et*

*seq.*; The Virginia Fraud Against Taxpayers Act, Va. Code §§8.01-216.1 *et seq.* and the

Wisconsin False Claims for Medical Assistance Act[1], Wis. Stats. §§20.931 (hereinafter referred

to collectively as the "State False Claims Acts" or "State FCA's"),  to recover all damages, civil

penalties and all other recoveries provided for under the Federal False Claims Act and the State

False Claims Acts.

## <u>SUMMARY OF THE CASE</u>

1.      This case involves Defendants' scheme to secretly overcharge federal and state

governments for prescription drug purchases paid for through grants issued by the Ryan White

HIV/AIDS Program, 42 U.S.C. § 300ff *et seq.* (the "Program").

2.      The Program is the largest government program focused exclusively on

HIV/AIDS care and provides billions of dollars in medical and pharmaceutical assistance for

individuals living with HIV/AIDS who have no health insurance, insufficient health care

coverage, or lack financial resources to get the care they need.

3.      Defendants UnitedHealth Group, Inc. ("UHG") and Cigna Corporation ("Cigna")

provide private primary health insurance, including prescription pharmaceutical insurance

coverage, and administrative services for self-insured plans.  Optum, Inc. ("Optum") (a wholly

owned subsidiary of UHG, as defined further below) provides pharmacy benefit manager

---

[1] The Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§ 20.931, *et seq.* was
repealed effective July 15, 2015.  Relator seeks to recover for false claims submitted prior to the
repeal.

("PBM") services for UHG, Cigna and others, including for the transactions at issue here. Cigna, UHG, and Optum are collectively referred to herein as "Defendants."

4.     Defendants provide pharmacy benefit services paid for by the Program. Unbeknownst to the public, however, Defendants have been engaged in a scheme wherein they unlawfully overcharge the Program millions of dollars.

5.     Defendants' scheme works as follows. An individual fills a prescription at a pharmacy for HIV/AIDS-related pharmaceuticals.  Defendants – who provide prescription drug coverage and/or PBM services – process and control the transaction. In the event the prescription is covered by the Program, government funds are used to pay for all or some of it. Program-covered prescriptions must be priced in the "most economical manner feasible" and pursuant to Program rules that ensure that the Program pays the lowest possible price for the prescription along with a "per transaction administrative fee" to compensate the PBM's efforts.

6.     Unbeknownst to the government, however, rather than charging the lowest amount and limiting their compensation to a fixed "administrative fee," Defendants have secretly and dramatically increased the cost of these Program-covered prescriptions for their own benefit. Defendants do so by replacing the authorized "administrative" fee-based system with a "spread-pricing" system pursuant to which Defendants charge the Program more than the amount paid to the pharmacy. The excess above the amount paid to the pharmacy is the "spread".  Defendants forcibly take back from the pharmacy the spread through what is known as a "clawback" in lieu of a reasonable administrative fee.  These undisclosed and unlawful spreads and clawbacks are paid by the Program.[2]  Defendants accomplish this fraud through an opaque billing system that they designed, control and keep secret through gag-clauses with participating pharmacies.

---

[2]  Defendants' "clawback" scheme also affects drugs that are paid for by others, such as patient/consumers, including Defendants' own insureds.  Transactions in which Defendants'

7.     Plaintiff brings this action to recoup government funds unlawfully taken by Defendants.

## THE PARTIES

### A.     Plaintiff/Relator

8.     Plaintiff Bryan Ticer is a citizen of Oklahoma.  He is a graduate of the University of Oklahoma Health Sciences Center where he earned a B.S. Pharmacy degree in 1995 and a PharmD degree in 2003.  He is a licensed pharmacist in Oklahoma and has served as a Pharmacy Manager at Wal-Mart and Sam's Club, among others.  Since 2013, he has been the Pharmacy Manager at Oklahoma University Pharmacists Care Center (a/k/a Pharmacy Providers of Oklahoma) where he supervises a team of 15 pharmacy staff members and serves as the Ryan White / ADAP Pharmacy Contract Manager and on the Oklahoma ADAP Formulary Committee.

### B.     Defendants UHG & Optum

9.     Defendant UHG is a Delaware corporation, headquartered in Minnetonka, Minnesota.  UHG is a diversified health care benefits provider to an array of customers, markets, employers, retirees and military personnel.  UHG operates in two distinct business platforms: health benefits under UnitedHealthcare ("UHC"); and health services under Optum.

10.     Defendant Optum, Inc., is a Delaware corporation with headquarters in Eden Prairie, Minnesota. Optum is a wholly owned subsidiary of UHG.

---

scheme defrauds Defendants' own insureds are currently the subject of several class action lawsuits on behalf of such insureds for, among others, violations of ERISA and RICO.  *Negron v. Cigna Health and Life Insurance*, No. 16-cv-1702 (D. Conn.); *Mohr-Lercara v. Oxford Health Insurance, Inc., et al.*, No. 18-cv-1427 (SDNY); and, *Sohmer v. UnitedHealth Group Inc.*, No. 18-cv-03191 (D. Minn.). Several states have explicitly outlawed this practice and at least one large PBM (Express Scripts) publicly announced that it does not impose "clawbacks." *See* http://lab.express-scripts.com/lab/insights/drug-options/keeping-copays-affordable. The existence of clawbacks in connection with the Program is not yet public.

11.    Optum is a health services business serving payers, care providers, employers, governments, life sciences companies and consumers. Optum is organized in three reportable segments: OptumHealth, OptumInsight and OptumRx.

12.    Defendant OptumRx, Inc. is a California corporation, headquartered in Irvine, California. OptumRx is a wholly owned subsidiary of Optum.

13.    In fiscal year 2017, UHG processed nearly three-quarters of a trillion dollars in gross billed health benefit charges, managed nearly $250 billion in aggregate health care spending and reported consolidated revenues of over $201 billion. *See* UHG 2017 Form 10-K at 1, 32. UHG is currently ranked 12th on the Fortune 500.

14.    Optum (including its OptumRx segment) represents a substantial segment of UHG's activities, providing annual pharmacy benefit services to 91 million individuals and fulfilling 1.3 billion prescription drug scripts giving rise to $85 billion in prescription drug spending. *See* UHG 2017 Form 10-K at 7-9.  OptumRx "provides a full spectrum of pharmacy care services to more than 65 million people in the United States through its network of more than 67,000 retail pharmacies, multiple home delivery and specialty pharmacies and through the provision of home infusion services."  *See* UHG 2017 Form 10-K at 9.

15.    In the years 2015, 2016 and 2017, Optum accounted for between 43% to 45% of UHG's gross revenues, and between 38% to 44% of UHG's gross earnings.  These services are primarily driven by OptumRx. In the years 2015, 2016 and 2017, OptumRx accounted for roughly 70% of Optum's gross revenues and between 41% and 47% of Optum's gross earnings. Of UHG's total 2017 activities, OptumRx represented 31.7% of gross UHG revenues and 20.5% of gross UHG earnings.

16.    In July 2015, UHG acquired Catamaran which generated in fiscal year end 2015 roughly $12.4 billion in revenues, representing 8% of UGH gross consolidated revenue. Similar

to OptumRx, Catamaran offered pharmacy benefits management services to millions of people, health plans, employers and IT solutions to the pharmacy benefits management industry. Catamaran previously served as the PBM for Cigna and other health insurance companies (a function that is now being performed by OptumRx).

17.      Accordingly, Optum (represented by Catamaran and OptumRx) is the PBM for not only the customers of UHC, but other medical and pharmacy benefit providers, including Cigna (defined below), Blue Cross Blue Shield and others.

18.      Finally, UHG is the parent entity for other insurance companies and/or PBMs, including Innoviant by prescription Solutions ("Innoviant") and PacifiCare Health System ("Pacificare"), who have engaged in the same wrongful conduct detailed herein.

**C.      Defendant Cigna**

19.      Defendant Cigna, through its wholly-owned subsidiaries, including Defendant Cigna Health and Life Insurance Company ("CHL"), is a fully integrated health insurance company. Cigna is a global health services organization, incorporated in Delaware, with its principal place of business in Bloomfield, Connecticut. In 2017, Cigna reported revenue in excess of $41.6 billion, and the company is currently ranked 79th on the Fortune 500.

20.      Cigna operates through three segments: (1) Global Health Care, which is comprised of the Commercial operating segment, which encompasses both the U.S. commercial and certain international health care businesses serving employers and their employees, and other groups, and the Government operating segment, which offers Medicare Advantage and Medicare Part D plans to seniors and Medicaid plans; (2) Global Supplemental Benefits, which offers supplemental health, life and accident insurance products in selected international markets and in the U.S; and, (3) Group Disability and Life, which provides group long-term and short-term disability, group life, accident and specialty insurance products and related services.

21.     Defendant CHL, incorporated in Connecticut, is a wholly-owned subsidiary of Cigna with its principal place of business in Bloomfield, Connecticut. CHL underwrites life and health insurance policies. The company provides group term life, accidental death and dismemberment, dental, weekly income, and long-term disability insurance.

22.     Cigna and its subsidiaries frequently use Optum as their PBM.

**D.     The Government Plaintiffs**

23.     The United States is a plaintiff in this action.  The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and the Center for Medicare and Medicaid Services ("CMS"), which administers the Medicare and Medicaid Programs.

24.     The States of Alaska, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New Hampshire, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Wisconsin, and the District of Columbia are plaintiffs for whom recovery is sought.

25.      The United States and the States are collectively referred to as the "Government Plaintiffs."

26.     Relator has standing to bring this action pursuant to 31 U.S.C. §3730(b)(1) and analogous provisions in the State False Claims Acts.  Relator brings this action on behalf of the United States for violations of the Federal False Claims Act and on behalf of each Plaintiff State named herein for violations of its respective State False Claims Acts.

27.      Relator's complaint is not based on any other prior public disclosures of the allegations or transactions discussed herein.  *See, e.g.,* 31 U.S.C. §3730(4)(A) and analogous state statutory provisions.

28.     Prior to filing this lawsuit, Relator voluntarily disclosed to the Government the information on which allegations or transactions in their claim are based.  Further, Relator has knowledge that is direct, independent of and materially adds to any potential publicly disclosed allegations or transactions.  Thus, Relator is an original sources as that term is used in the False Claims Act and analogous state statutory provisions.  *See*, *e.g.*, 31 U.S.C. §3730(4)(B).

**JURISDICTION AND VENUE**

29.     Jurisdiction is founded upon the Federal False Claims Act, 31 U.S.C. § 3729 et *seq.*, specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.

30.      Venue in this District is appropriate under 31 U.S.C. § 3732(a) and sufficient contacts exist for jurisdiction in that the Defendants transact or transacted business in this District.

**BACKGROUND INFORMATION ON THE PHARMACEUTICAL INDUSTRY**

**A.     Industry Participants and Their Respective Roles**

31.     If a health plan covers outpatient prescription drugs, the cost of the drug is often shared between the insured and the insurer. Such cost sharing can take the form of deductible payments, co-insurance payments, and co-payments.

32.     In general, deductibles are the dollar amounts the insured pays during the benefit period (usually a year) before the insurer starts to make payments for pharmaceutical costs. Co-insurance requires an insured person to pay a stated percentage of pharmaceutical costs, often after exhausting the deductible limit. Co-payments are fixed dollar payments made by an insured toward pharmaceutical costs.

33.     The provision of prescription drugs to patients involves business arrangements among numerous entities, including, but not limited to, pharmaceutical manufacturers,

pharmaceutical wholesalers, pharmacy benefit managers ("PBMs"), pharmacies, health insurance companies, employers and insureds.

34. On the distribution side of the prescription market, the pharmaceutical manufacturer typically sells its drugs to a wholesaler, which then sells the drugs to a retail pharmacy. The retail pharmacy then distributes the drugs to insureds from its inventory.

35. The retail side of the prescription market is largely controlled by insurance companies and their contracted or owned PBMs. In most instances where a health plan provides prescription benefits, the PBM is the agent of the insurance company, i.e., the PBM is responsible for administering the prescription benefit for the insurance company's insureds. For example, unless specifically carved out, Optum generally serves as the PBM for individuals insured by UHG and Cigna.

36. According to the Pharmaceutical Care Management Association, PBMs manage pharmacy benefits for 266 million Americans as of 2016.

37. The three largest PBMs are: (i) Optum (owned by UHG); (ii) CVS Caremark; and, (iii) Express Scripts. These three companies manage the pharmacy benefits of approximately 75% of the market, and cover 180 million enrollees.

38. Among the key functions of a PBM is to create and maintain a "network" of participating pharmacies that insureds may visit to access their prescription drug health benefits and facilitate payment for those pharmacies in the network.

39. Insureds are unlikely to visit pharmacies that are out of their network, because such pharmacies cannot receive payment from the insured's insurance company. So if a patient is insured by Cigna (whose PBM is Optum) and the patient fills a prescription at a pharmacy that is not in Optum's "network," the insured will have to pay the full price of the prescription, whereas

if the pharmacy is within Optum's network and the prescription is covered under the Cigna

policy, Cigna will pay for the insured's prescription.

40.     Thus understood, the financial viability of a pharmacy is largely dependent on the

pharmacy being "in network" for as many PBM's as possible, and particularly the three large

PBMs (Optum, Caremark, and ExpressScripts).

41.     When an insured presents a prescription at a pharmacy, key information such as

the patient's name, pharmaceutical dispensed, and quantity dispensed is transmitted at the point

of sale via interstate wire to a "switch" that then directs the information to the correct PBM.

42.     The PBM instantaneously processes the claim according to the benefits plan

assigned to the insured. The PBM electronically transmits via interstate wire a message back to

the pharmacy indicating whether the pharmaceutical and patient are covered and, if so, the

amount the pharmacy must charge the insured as a co-payment, co-insurance, or to be paid

toward a deductible.

43.     The PBM typically is responsible to pay the pharmacy any amounts owed to the

pharmacy over the insured's co-payment, co-insurance, or deductible charges.  These payments

are typically made bi-weekly, i.e., every two weeks for the claims that were processed by any

given pharmacy in the prior two-week period.

**B.     Agreements Among Industry Participants**

44.     Contractual relationships exist between insureds (including their employers or the

government) and health insurance companies; the health insurance companies and the PBMs;

and the PBMs and the pharmacies.

45.     Typically, the government, employers or individuals themselves buy a health

insurance policy from a health insurance company to provide, *inter alia*, coverage for

prescription drugs.  Health insurance companies then hire PBMs to manage and administer the drug benefits offered pursuant to those policies.

46.    The following diagram represents (in simplified form) the contractual relationships among the various parties to a pharmaceutical transaction:



(a)    **Government/Employer/Individual–Insurer/Administrator Agreements (*i.e.*, Insurance Policies).**  Many health insurance policies provide, *inter alia*, prescription pharmacy benefits. These policies contain uniform provisions that set forth key plan terms such as the mechanism for and amount of the deductible, co-payment, and/or co-insurance that an insured must pay to obtain prescription pharmacy benefits.

(b)    **Insurer–PBM Agreements.**  Health insurance companies contract with and/or own PBMs, which act as their agents to administer the prescription pharmacy benefits purchased through the health insurance policies that the insurers issue.

(c)    **PBM–Pharmacy Agreements.**  PBMs in turn, contract with pharmacies, which serve as providers in the insurers' pharmacy network. The pharmacies fill prescriptions that are covered under the insurers' policies. If a pharmacy wishes to be in a PBMs network, the pharmacy must sign an agreement with the PBM.  Under these agreements (hereinafter "Network Agreements"), the pharmacies are contractually required to: (1) fill any and all prescriptions presented by an insured; (2) charge the insured the precise amounts dictated by the PBM/Insurer for the prescriptions being filled; and, (3) accept from the PBM/Insurer as "reimbursement" any

amounts determined by the PBM/Insurer. As a result of these relationships, pharmacies have little to no discretion with regard to the pricing and charges associates with a drug transaction.

47.     Moreover, those same agreements with PBMs typically contain gag-clauses which prohibit pharmacies from informing an insured that the amount the insured owes under his or her insurance plan is greater than the pharmacy's charges (or the amount the pharmacy has agreed to accept as payment in full) for the drug.

48.     Pharmacies that object to the terms of Network Agreements are not permitted to be included in the PBM's network.  Pharmacies that are not included in the networks operated by Optum, Caremark, and ExpressScripts suffer significant financial losses and often go out of business, or are forced to sell their business to someone who is willing to sign the Network Agreements.

49.     The relationship among the parties is shown graphically as follows:



50.     Pursuant to the health insurance plans between an insurance company and its customers, insurers are typically required to ensure that, when they contract with a PBM to act as

their agent to manage prescription drug benefits under the health insurance policies, the PBM
follows the plans' terms.

51.     Nonetheless, PBMs, acting as agents and/or in concert with health insurance
companies, routinely charge insureds substantially higher prices for drug than are allowed under
the health insurance policies.

**C.     Description of a Typical Prescription Drug Transaction**

52.     The process by which a prescription is filled and paid for is carried out
electronically through a series of intermediaries. At the point of sale, the pharmacist manually
enters basic information regarding the transaction into the pharmacy computer terminal, such as
the customer's personal contact information, applicable insurance provider(s) and the
prescription(s) sought.

53.     Importantly, while such pharmacy computer systems use certain automatically
pre-populated fields with data drawn and updated automatically from third-party sources, any
relevant pricing data at issue is provided by, or superseded with data from, the primary insurance
provider and/or the PBM.

54.     Once this initial data is entered, the pharmacy submits the transaction into the
computer system controlled by the PBM.  At this time, data is transmitted to a "switch" whose
function is to connect the pharmacy's computer terminal with the other relevant parties—the
PBM and/or primary insurer.

55.     The "switch" routes the data to the PBM and/or insurer, who determines
coverage, adjudicates the claim and calculates the various payment and reimbursement amounts
for each of the parties to the transaction.

56.     The same electronic sequence occurs when the primary or secondary payer is the
government or a governmental program.

14

57.     A response to the submitted claim is transmitted back to the pharmacy within a few seconds of its submission.  The response tells the pharmacy how much any insurer (private or government) will pay – i.e., "reimburse" – the pharmacy.  However, in certain transactions where the PBM imposes a clawback, the pharmacy is directed by the PBM to pay the PBM – i.e., a "negative reimbursement" – and so the response tells the pharmacy how much it has to pay the PBM.

58.     This process is governed by a standard protocol developed by the National Council for Prescription Drug Programs ("NCPDP"). NCPDP standards provide for a common format and definition of specific data fields.  In other words, they ensure that all of the computers involved speak the same language. The government and private insurers therefore require the use of NCPDP standards. *See* 45 C.F.R. § 162.1102.

59.     NCPDP fields are all formatted such that certain fields cannot contain a negative number.  Were a negative number to appear in such a regulated field, the system would reject the transaction or change the negative value to zero and accept it.  Such is the case with the "Other Payer Amount Paid Field" identified as 431-DV.

60.     The 431-DV field normally contains a positive number that reflects the financial obligation (if any) of the primary insurer, i.e., the amount of money the primary insurer will pay the pharmacy to cover the insured's pharmaceutical purchase.

61.     As noted in detail below, in certain transaction, the pharmacy is directed by the PBM to pay a clawback to Defendants.  In those instances, the clawback imposed on the pharmacy by the PBM is reflected in this field as a negative number, meaning that rather than receiving money to fill the prescription, the pharmacy is directed to pay money to the PBM.

62.     Defendants have formatted the 431-DV field to convert any negative number into a zero, i.e., the clawback (i.e., a negative number in this field) is converted to a zero, even though

the pharmacy is still required to pay the clawback. This essentially masks the clawback for all participants in the transaction with the exception of the pharmacist (who must pay the clawback) and the PBM/Insurer (who receives the clawback).

63.     Under the Network Agreements in which pharmacies are effectively forced to enter, pharmacies have no discretion with respect to how much they ultimately charge for a drug or how any payments for drugs are allocated between pharmacies and the other parties to the transaction, including clawbacks.

## THE RYAN WHITE PROGRAM

64.     The Ryan White HIV/AIDS Program, 42 U.S.C. § 300ff *et seq.* (the "Program") is the largest government program focused exclusively on HIV/AIDS care. The Program reaches approximately 52% of all people diagnosed with HIV in the United States. The Program thus provides critical financial support for the most vulnerable patients.

65.     The Program was created in 1990 pursuant to the Ryan White Comprehensive AIDS Resources Emergency (CARE) Act. The Program has been amended and reauthorized multiple times (in 1996, 2000, 2006 and 2009). The authorization for appropriations expired in 2013, but the Program continues to operate as long as Congress appropriates funding.

66.     The Program is administered and/or funded by the U.S. Department of Health and Human Services ("HHS"), the Centers for Disease Control and Prevention ("CDC"), the Health Resources and Services Administration ("HRSA"), and the HIV/AIDS Bureau ("HAB").

67.     According to the HRSA website, the Program is for individuals living with HIV/AIDS who have no health insurance, have insufficient health care coverage or lack financial resources to get the care they need. The majority of Program funds support primary medical care and essential support services, and a smaller portion supports technical assistance, clinical training and research on innovative models of care.

16

68.     The legislation that created the Program specifies a number of Parts to meet the needs of different communities and populations. Part A provides emergency assistance to certain metropolitan and other areas that are most severely affected by the HIV/AIDS epidemic. Part B provides grants to the States, the District of Columbia and certain U.S. territories. Part C provides comprehensive primary health care in an outpatient setting for people living with HIV disease. Part D provides family-centered care involving outpatient or ambulatory care for women, infants, children, and youth with HIV/AIDS. Part E includes provisions regarding coordination of federal HIV programs, audits and other matters, but has not been appropriated funds.  Part F provides funding for other programs, including training programs for providers treating people with HIV/AIDS.

**A.      Part B of the Program and ADAPs**

69.     Part B of the Program funds core medical services and provides, among others, grants to States and Territories to improve the quality, availability and organization of HIV health care and support services. The specific allowable services funded by each State/Territory are determined at the State/Territory level based on needs assessment and available funding. Core medical services include outpatient and ambulatory health services, pharmaceutical assistance and the AIDS Drug Assistance Program ("ADAP").

70.     An ADAP is a State/Territory-administered program authorized under Part B of the Program that provides FDA-approved medications to low-income individuals with HIV disease who have limited or no coverage from private insurance, Medicaid, or Medicare. Program funds may also be used for premium assistance – to help purchase health insurance for eligible clients and for services that enhance access to, adherence to, and monitoring of drug treatments. HIV drugs are costly, and many people living with HIV in the U.S. are unable to pay for the medications without assistance through ADAP. The number of individuals on ADAP

17

assistance has grown significantly in recent years due to: increased HIV testing, resulting in more people learning their HIV status; PHS guidelines indicating the need for early treatment of infected individuals; people living longer with HIV; more intensive use of HIV drugs by long term survivors; economic conditions; increased cost-sharing associated with health insurance; increased cost of medications and insurance; and reductions in State/Territory funding for other programs.

71.     Part B grant recipients are the chief elected officials of a State/Territory who designate the state department of health or another state entity to implement and manage the Part B grant. In fiscal year 2018, the Program's Part B grant awards were as follows:

| Part B Grant Recipient | Base Award | ADAP Award | ADAP Supplemental Award | Final Award* | Final Supplemental Award** |
|---|---|---|---|---|---|
| Alabama | $8,060,177 | $10,594,199 | $0 | $19,121,678 | $12,335,911 |
| Alaska | $500,000 | $580,102 | $0 | $1,080,102 | $425,451 |
| Arizona | $4,113,644 | $12,000,459 | $0 | $16,114,103 | $0 |
| Arkansas | $3,374,295 | $4,552,010 | $0 | $7,976,074 | $0 |
| California | $33,135,968 | $105,659,276 | $0 | $140,198,224 | $23,765,871 |
| Colorado | $3,362,667 | $9,768,043 | $0 | $13,206,709 | $0 |
| Connecticut | $2,728,988 | $8,869,373 | $0 | $11,598,361 | $0 |
| Delaware | $2,027,597 | $2,665,049 | $0 | $4,924,238 | $0 |
| District of Columbia | $3,718,903 | $6,300,456 | $0 | $10,231,103 | $0 |
| Florida | $30,367,329 | $89,515,812 | $0 | $121,623,067 | $20,900,239 |
| Georgia | $13,986,055 | $37,634,950 | $8,934,091 | $61,316,148 | $2,060,818 |
| Hawaii | $1,640,178 | $2,155,830 | $0 | $3,817,920 | $0 |
| Idaho | $577,100 | $758,533 | $400,000 | $1,735,633 | $2,934,719 |
| Illinois | $9,546,822 | $30,334,787 | $2,669,140 | $42,977,455 | $0 |
| Indiana | $3,609,343 | $8,643,687 | $2,721,017 | $14,974,047 | $11,509,813 |
| Iowa | $1,438,100 | $1,890,221 | $0 | $3,328,321 | $10,760,441 |
| Kansas | $1,095,007 | $2,539,577 | $0 | $3,634,584 | $0 |
| Kentucky | $4,092,386 | $5,378,982 | $0 | $9,791,461 | $0 |
| Louisiana | $6,476,557 | $17,387,588 | $0 | $24,120,542 | $0 |
| Maine | $786,616 | $1,033,918 | $0 | $1,820,534 | $1,627,018 |
| Maryland | $7,975,128 | $26,740,923 | $0 | $35,166,231 | $0 |
| Massachusetts | $5,204,324 | $16,095,394 | $0 | $21,484,450 | $5,104,136 |

18

| | | | | | |
|---|---|---|---|---|---|
| Michigan | $5,067,469 | $13,579,445 | $0 | $18,825,877 | $0 |
| Minnesota | $2,043,212 | $6,444,676 | $0 | $8,551,919 | $2,269,463 |
| Mississippi | $5,778,432 | $7,819,160 | $0 | $14,000,685 | $3,510,443 |
| Missouri | $3,486,897 | $10,281,335 | $0 | $13,876,104 | $589,105 |
| Montana | $500,000 | $364,193 | $0 | $864,193 | $566,491 |
| Nebraska | $1,242,221 | $1,632,760 | $0 | $2,874,981 | $1,317,007 |
| Nevada | $2,187,045 | $6,855,310 | $0 | $9,116,697 | $0 |
| New Hampshire | $500,000 | $978,515 | $0 | $1,478,515 | $0 |
| New Jersey | $10,105,758 | $30,505,884 | $0 | $41,090,539 | $754,999 |
| New Mexico | $1,848,454 | $2,429,586 | $0 | $4,278,040 | $0 |
| New York | $34,111,900 | $106,716,823 | $0 | $143,110,247 | $26,333,142 |
| North Carolina | $11,495,064 | $23,827,375 | $0 | $35,980,775 | $2,612,392 |
| North Dakota | $500,000 | $240,351 | $0 | $740,351 | $161,348 |
| Ohio | $7,122,704 | $17,420,178 | $0 | $24,872,458 | $0 |
| Oklahoma | $3,598,969 | $4,730,441 | $0 | $8,556,679 | $0 |
| Oregon | $1,145,186 | $4,891,761 | $0 | $6,036,947 | $0 |
| Pennsylvania | $10,617,820 | $28,064,078 | $0 | $39,338,364 | $0 |
| Puerto Rico | $5,757,976 | $15,260,275 | $3,972,304 | $25,288,768 | $14,277,230 |
| Rhode Island | $1,525,502 | $2,005,101 | $0 | $3,744,994 | $2,505,974 |
| South Carolina | $10,170,016 | $13,616,923 | $0 | $24,550,244 | $12,038,386 |
| South Dakota | $500,000 | $439,965 | $0 | $939,965 | $0 |
| Tennessee | $5,053,896 | $14,041,408 | $0 | $19,274,076 | $0 |
| Texas | $23,581,066 | $68,823,596 | $0 | $93,383,157 | $1,884,208 |
| Utah | $1,720,141 | $2,260,932 | $167,772 | $4,164,287 | $1,999,675 |
| Vermont | $500,000 | $407,375 | $0 | $907,375 | $0 |
| Virginia | $7,068,769 | $18,646,378 | $0 | $26,349,698 | $0 |
| Washington | $3,612,726 | $10,180,306 | $0 | $13,871,087 | $0 |
| West Virginia | $1,008,638 | $1,442,108 | $0 | $2,450,746 | $0 |
| Wisconsin | $3,588,620 | $4,741,847 | $0 | $8,642,123 | $2,509,106 |
| Wyoming | $500,000 | $253,387 | $0 | $753,387 | $0 |
| Guam | $200,000 | $65,180 | $0 | $265,180 | $0 |
| Virgin Islands | $500,000 | $517,367 | $0 | $1,026,626 | $650,838 |
| American Samoa | $32,093 | $815 | $0 | $32,908 | $0 |
| Marshall Islands | $26,206 | $815 | $0 | $27,021 | $0 |
| Mariana Island | $50,000 | $4,074 | $0 | $54,074 | $10,478 |
| Republic of Palau | $20,449 | $4,147 | $0 | $24,596 | $0 |
| F. States Micronesia | $50,000 | $815 | $0 | $50,815 | $0 |
| **TOTALS** | **$314,634,413** | **$820,593,854** | **$18,864,324** | **$1,169,635,483** | **$165,414,702** |

*See* HRSA FY 2018 Ryan White HIV/AIDS Program Part B Grant Awards (available at
https://hab.hrsa.gov/awards/fy-2018-ryan-white-hivaids-program-part-b-grant-awards).

\* The Final Award includes Base, ADAP, ADAP Supplemental, Emerging Communities, and Minority AIDS Initiative funding.
\*\*The Final Supplemental Award includes Priority Funding.

72.     Recipients can choose to allocate other funding to ADAP, including State/Territory, local and Federal resources. ADAP-generated Program income and rebates can also be allocated back to the ADAP, since they must be used for Part B allowable services, with priority (for rebates) given to ADAP. All funds allocated to ADAP are subject to HRSA, HAB, ADAP Program expectations.

73.     All 50 states, the District of Columbia, Puerto Rico, Guam, the U.S. Virgin Islands, and the five U.S. Pacific Territories/Associated Jurisdictions are eligible for Part B funding.

74.     Part B Base and ADAP base awards are determined using a formula based on reported living cases of HIV in the State/Territory in the most recent calendar year for which data is available. The ADAP base awards provide access to HIV-related medications through the purchase of medication and the purchase of health insurance coverage. A limited amount of ADAP funds can pay for services that enhance access, adherence, and monitoring of drug treatments. Of the ADAP appropriation, 5% is reserved for additional funding to states and territories that have a severe need for medication assistance, which they can apply for through ADAP Supplemental.

75.     Pursuant to the Program, each ADAP must cover at least one drug from each class of HIV antiretroviral medications on its ADAP formulary. Program funds may only be used to purchase FDA-approved medications.  Within these requirements, each ADAP decides which medications to include on its formulary and how those medications will be distributed. HRSA requires that ADAP eligibility criteria must be consistently applied across the state or territory,

20

and that all formulary medications and ADAP-funded services must be equally and consistently available to all eligible enrolled people throughout the state or territory.

76.     Finally, Part B grants – like all HHS, HRSA and CDC funding – are contingent upon compliance with standard terms and conditions that attach to all such grants. The standard terms and conditions of HHS grants are set forth in federal regulations and are further explained in the HHS Grants Policy Statement ("HHS GPS")[3] which states that:

**Flow-Down of Requirements under Subawards and Contracts under Grants**

The terms and conditions in the HHS GPS apply directly to the recipient of HHS funds. The recipient is accountable for the performance of the project, program, or activity; the appropriate expenditure of funds under the award by all parties; and all other obligations of the recipient, as cited in the NoA. ***In general, the requirements that apply to the recipient, including public policy requirements, also apply to subrecipients and contractors under grants, unless an exception is specified.***

*Id.* at II-2 (emphasis added). With respect to allowable costs and activities, the HSS GPS states:

Subrecipients and contractors under grants are subject to the requirements of the cost principles otherwise applicable to their type of organization and to any requirements placed on them by the recipient to be able to comply with the terms and conditions of the award.

The cost principles do not address profit or fee. HHS policy allows the payment of fee on SBIR/STTR grants, ***but HHS will not provide profit or fee to any other type of recipient under any other grant program. A fee may not be paid by a recipient to a subrecipient/consortium participant, including a for-profit organization.*** However, a fee (profit) may be paid to a contractor providing routine goods or services under a grant in accordance with normal commercial practice.

*Id.* at II-29 (emphasis added). Finally, with respect to fraud, waste and abuse, the HHS GPS reiterates:

The Civil False Claims Act, 31 U.S.C. 3729(a), provides for imposition of penalties and damages by the United States, through civil litigation, against any person who knowingly makes a false or fraudulent claim for payment, makes or uses a false record or false statement to get a false claim paid or approved, or

---

[3] *See* https://www.hhs.gov/sites/default/files/grants/grants/policies-regulations/hhsgps107.pdf.

conspires to defraud the Federal government to get a false claim paid. ***A "false claim" is any request or demand for money or property made to the United States or to a contractor, grantee, or other recipient, if the Federal government provides or will reimburse any portion of the funds claimed.*** Civil penalties of $5,500 to $11,000 may be imposed for each false claim, plus damages of up to three times the amount of the false claim.

*Id.* at I-8 (emphasis added).

## B.      ADAP Operations & Costs

77.      The Program is intended to fill gaps in care and serve as "the payer of last resort." According to HRSA, this means that Program funds "can only be used to pay for allowable costs when there is no other public or private payer or when the costs are not covered by other public and private payers."  HRSA ADAP Manual 2016 at 34.

78.      ADAPs often contract with third parties to provide pharmacy services to their clients. These services are generally divided into two categories: direct pharmacy services provided by Pharmacy Benefits Managers ("PBM"s) and benefit coordination services provided by Insurance Benefits Managers ("IBM"s). Direct pharmacy services are typically designed for uninsured ADAP clients, while benefit coordination services support insured ADAP clients. Direct pharmacy services may include the establishment and maintenance of an ADAP formulary, establishing a network of pharmacies that distribute drugs to uninsured ADAP clients, negotiating contracts with wholesalers and pharmacies, and processing the delivery of drugs to uninsured ADAP clients. Benefit coordination services may include coordinating cost-sharing payments to pharmacies, establishing a network of pharmacies that accept ADAP cost-sharing payments, processing claims data to support ADAP rebate submission, and facilitating insurance premium payment for ADAP clients.

79.      PBMs are the contractors for direct pharmacy services. While many ADAPs may use the same contractor for both their direct pharmacy services and benefit coordination services,

22

PBM services only include direct pharmacy services. This is consistent with industry definitions of a PBM; typically, PBMs coordinate the pharmacy benefit design for an insurance company or administrator, establishing the formulary and pharmacy network. When a State/Territory ADAP contracts with a PBM, the State/Territory must follow the same documented procurement procedures that it would use for procurements with non-Federal funds. The procedures must also conform to the requirements in the HHS Uniform Guidance (45 CFR part 75). In addition to the information specified in the HHS Uniform Guidance, ADAP-related sub-awards must specify the scope of work, methods, budget, deadlines, deliverables and oversight responsibility. ADAP-related subcontractors – including PBMs and pharmacies – must agree to act as agents on behalf of the ADAP, fully disclose all costs and maintain compliance with the Program, its related policies, and state and federal law. Indeed, according to PCN13-03, Program funds must be diligently conserved by not just the ADAPs but all ADAP-related entities: "Grantees and their contractors are expected to vigorously pursue enrollment into health care coverage for which their clients may be eligible (e.g., Medicaid, CHIP, Medicare, state-funded HIV/AIDS programs, employer sponsored health insurance coverage, and/or other private health insurance) to extend finite RWHAP grant resources to new clients and/or needed services."

80.     As a federally funded program, ADAPs are required acquire drugs "in the most economical manner feasible" (42 CFR Part 50, Subpart E). According to HRSA, ADAPs are subject to the "best pricing" rule such that an ADAP must "use every means at its disposal to secure the best price available for all products on the ADAP formulary" and to comply with the "340B program rules (i.e., prohibitions on diversion, duplicate discounts and 'double dipping')." HRSA ADAP Manual 2016 at 59. The "best pricing" rule is predicated on HRSA Policy Clarification Notice (PCN") 11-06 *Aids Drug Assistance Program: Use of Funds, Eligibility and Formulary Parity, Administration, Quality Assurance and Cost Savings* and the 340B Drug

Pricing Program ("340B Program"), which is a federal drug pricing program administered by

HRSA's Office of Pharmacy Affairs (OPA) that provides Federally-designated entities

(including ADAPs and other Program recipients) with access to discounted medications. The

340B Program enables eligible entities to stretch scarce resources, allowing them to reach more

eligible patients and provide more comprehensive services.

81.     On December 12, 2017, the HRSA announced the retirement of policy 11-06

since it was no longer necessary due to the issuance of subsequent PCNs and based on the

Program's regulatory language.  According to HRSA:

> The RWHAP statutory language most pertinent to AIDS Drug Assistance
> Programs (ADAP) can be found at section 2616 of title XXVI of the Public
> Health Service (PHS) Act. Section 2618(b)(3) of the PHS Act addresses
> administrative and quality assurance requirements, and section 2622(d) of the
> PHS Act addresses the treatment of pharmaceutical rebates. The requirement that
> program funds used for the acquisition of drugs be expended in the most
> economical manner feasible is codified at 42 C.F.R. § 50.503.

According to 42 C.F.R. § 50.503:

> **Policy.**
>
> It is the policy of the Secretary that program funds which are utilized for the acquisition
> of drugs be expended in the most economical manner feasible. In furtherance of this
> policy, the Secretary has established, in 45 CFR part 19, a procedure for determining the
> Maximum Allowable Cost for drugs which are purchased with program funds.

According to 42 C.F.R. § 50.504:

> **Allowable cost of drugs.**
>
> **(a)** The maximum amount which may be expended from program funds for the
> acquisition of any drug shall be the lowest of
>
> > **(1)** The maximum allowable cost (MAC) of the drug, if any, established in
> > accordance with 45 CFR part 19, plus a dispensing fee determined by
> > the Secretary in accordance with paragraph (b) of this section, to be
> > reasonable;
> >
> > **(2)** The acquisition cost of the drug plus a dispensing fee determined by
> > the Secretary, in accordance with paragraph (b) of this section, to be
> > reasonable; or

**(3)** The provider's usual and customary charge to the public for the drug; *Provided,* That the MAC established for any drug shall not apply to a brand of that drug prescribed for a patient which the prescriber has certified, in accordance with paragraph (c) of this section, is medically necessary for that patient; *And Provided further,* That where compensation for drug dispensing is included in other costs allowable under the applicable program statute and regulations, the terms and conditions of the grant or contract, and the applicable cost principles prescribed in 45 CFR part 75, subpart E, no separate dispensing fee will be recognized.

**(b)** In determining whether a dispensing fee is reasonable, the Secretary will take into account:

**(1)** Cost components such as overhead, professional services, and profits;

**(2)** Payment practices of third-party payment organizations, including other Federal programs such as titles XVIII and XIX of the Social Security Act; and

**(3)** Any surveys by States, universities or others of costs of pharmacy operations and the fees charged in the particular area.

**(c)** A certification by a prescriber, pursuant to paragraph (a) of this section, that a brand of drug is medically necessary for a particular patient shall be in the prescriber's own handwriting, in such form and manner as the Secretary may prescribe. An example of an acceptable certification is the notation "brand necessary". A procedure for checking a box on a form will not constitute an acceptable certification.

82.     According to HRSA, an ADAP's use of a PBM to provide administrative and pharmacy claim adjudicative services provides an ADAP with the PBM's "purchasing power" and a "wide-range of administrative and drug utilization services that can benefit an ADAP." These administrative functions typically include (among others), establishing and maintaining a network of providers that fill prescriptions and negotiating prices and payment terms with such pharmacies.  In addition, PBMs perform a variety of drug utilization functions, including (among others) managing drug utilization to reduce costs and maintain or improve quality. These functions include policies and programs to affect prescribing and dispensing patterns, formulary and formulary related activities (e.g. rebate management, prior authorization therapeutic

interchange) and Drug use review. For these services, the Program limits the compensation

PBM's can charge only to "Administrative Fees."  According to HRSA:

> **PBM Administrative Fees**
>
> PBMs may charge a per transaction administrative fee, depending on the number
> and extent of services that they are contracted to perform. The fees charges [sic],
> if any, are dependent on the contract terms negotiated between the ADAP and
> PBM. ADAPs that contract with a PBM pay for the cost of the drug, the
> pharmacy dispensing fee, and an additional per claim administrative fee. In some
> cases, the administrative fee is rolled into the dispensing fee charged per
> prescription. The costs of a PBM are considered a "direct service" and do not
> count against a RWHAP Part B recipient's 10% administrative cost cap. HRSA
> Policy Clarification Notice 15-01, Treatment of Costs under the 10%
> Administrative Cap for Ryan White HIV/AIDS Program Parts A, B, C, and D,
> provides updated guidance on what costs count towards the administrative cap.

HRSA ADAP Manual 2016 at 52.

83.     Accordingly under the Program, the pharmacy may only be paid the cost of the

drug plus a reasonable dispensing fee.  The PBM may only be paid a reasonable per transaction

administrative fee.  The Administrative Fee is typically a flat fee per transaction.  For example,

Caremark charges a 50 cent administrative fee for cheaper drugs but up to $3.50 for more

expensive, unique drugs.

84.     This "fee-based" model is in contrast to "spread-pricing" in which rather than

charging a fixed administrative fee, a PBM or insurer will "mark up–sometimes dramatically–the

difference between the amount they reimburse pharmacies for a drug and the amount they charge

their clients." *See* Robert Langreth, et al., *The Secret Drug Pricing Systems Middlemen Use to

Rake in Millions,* Bloomberg, Sept. 11, 2018 (https://www.bloomberg.com/graphics/2018-

drug-spread-pricing/) ("PBMs say customers—governments and employers—have a choice

about whether to use spread pricing, or fee-based arrangements where drug prices are passed

along directly").

85.     In other words, under the spread pricing model, the Program pays the pharmacy substantially more than the cost of the drug plus a reasonable dispensing fee.  The PBM then takes this spread through a clawback. The spread/clawback model violates the Program's strict rules, which provide that a PBM must ensure that it only charge the Program the "best price" for the drug, and that the PBM's compensation is limited to a "per transaction administrative fee." Those same rules also highlight the applicability of the FCA for any such rule violation.

### DEFENDANTS' FALSE CLAIMS
### AND THE RESULTING DAMAGES TO
### THE GOVERNMENT PLAINTIFFS

86.     In his role as a pharmacist, Relator analyzed several years' worth of pharmaceutical transactions that were eligible for ADAP co-pay assistance and where Defendants served as the insurer and/or the PBM.  These transactions took place between January 1, 2014 and September 25, 2018. Of those transactions in which ADAP paid the required co-pay amount, Relator identified hundreds of instances in which Defendants imposed an undisclosed spread and clawback. In other words, Defendants – exercising near-total control over the electronic adjudicating process and using the pharmacy as an intermediary – secretly pocketed ADAP funds in exchange for providing no services. In fact, in certain instances the clawback amount taken by Defendants in connection with these drug purchases actually exceeded the cost of the very drug being bought.

87.     Below are some examples from UHC:

i.     On September 22, 2014, a customer at Relator's pharmacy sought to fill a prescription for Hydroxyz HCL 50 MG. The drug had a net cost of $8.14. UHC (as the customer's primary insurer) and/or Optum (as the PBM) required a $10.00 co-pay. Because the transaction was eligible for ADAP co-pay assistance, UHC and/or Optum instantaneously adjudicated the transaction such that the ADAP paid the $10.00 co-pay. However, unbeknownst

27

to the customer, the government or the pharmacy (until Relator conducted this analysis), UHC and/or Optum imposed a clawback of $3.98.  As a result, UHC and Optum submitted to ADAP a request for payment of $10.00, for a drug that cost $8.14, without disclosing that UHC and/or Optum were collecting a clawback of $3.98.

      ii.      On September 21, 2015, a customer at Relator's pharmacy sought to fill a prescription for Vitamin D. The drug had a net cost of 87 cents. UHC (as the customer's primary insurer) and/or Optum (as the PBM) required a $15.00 co-pay. Because the transaction was eligible for ADAP co-pay assistance, UHC and/or Optum instantaneously adjudicated the transaction such that the ADAP paid the $15.00 co-pay. However, unbeknownst to the customer, the government or the pharmacy (until Relator conducted this analysis), UHC and/or Optum imposed a clawback of $8.79.  As a result, UHC and Optum submitted to ADAP a request for payment of $15.00, for a drug that cost 87 cents, without disclosing that UHC and/or Optum were collecting a clawback of $8.79.

      iii.      On May 23, 2016, a customer at Relator's pharmacy sought to fill a prescription for Fluticasone. The drug had a net cost of $3.18. UHC (as the customer's primary insurer) and/or Optum (as the PBM) required a $35.00 co-pay. Because the transaction was eligible for ADAP co-pay assistance, UHC and/or Optum instantaneously adjudicated the transaction such that the ADAP paid the $35.00 co-pay. However, unbeknownst to the customer, the government or the pharmacy (until Relator conducted this analysis), UHC and/or Optum imposed a clawback of $27.44.  As a result, UHC and Optum submitted to ADAP a request for payment of $35.00, for a drug that cost 3.18, without disclosing that UHC and/or Optum were collecting a clawback of $27.44.

      iv.      On November 4, 2016, a customer at Relator's pharmacy sought to fill a prescription for Metformin 500MG. The drug had a net cost of $1.27. UHC (as the customer's

primary insurer) and/or Optum (as the PBM) required a $15.00 co-pay. Because the transaction was eligible for ADAP co-pay assistance, UHC and/or Optum instantaneously adjudicated the transaction such that the ADAP paid the $15.00 co-pay. However, unbeknownst to the customer, the government or the pharmacy (until Relator conducted this analysis), UHC and/or Optum imposed a clawback of $6.80.  As a result, UHC and Optum submitted to ADAP a request for payment of $15.00, for a drug that cost $1.27, without disclosing that UHC and/or Optum were collecting a clawback of $6.80.

          v.       On July 12, 2017, a customer at Relator's pharmacy sought to fill a prescription for Oxycodone 10 MG. The drug had a net cost of $2.88. UHC (as the customer's primary insurer) and/or Optum (as the PBM) required a $13.76 co-pay. Because the transaction was eligible for ADAP co-pay assistance, UHC and/or Optum instantaneously adjudicated the transaction such that the ADAP paid the $13.76 co-pay. However, unbeknownst to the customer, the government or the pharmacy (until Relator conducted this analysis), UHC and/or Optum imposed a clawback of $8.76.  As a result, UHC and Optum submitted to ADAP a request for payment of $13.76, for a drug that cost $2.88, without disclosing that UHC and/or Optum were collecting a clawback of $8.76.

        88.      Below are some examples from Cigna:

          i.       On September 8, 2014, a customer at Relator's pharmacy sought to fill a prescription for SMZ/TMP DS 800-160. The drug had a net cost of $1.07. Cigna (as the customer's primary insurer) and/or Optum (as the PBM) required a $8.00 co-pay. Because the transaction was eligible for ADAP co-pay assistance, UHC and/or Optum instantaneously adjudicated the transaction such that the ADAP paid the $8.00 co-pay. However, unbeknownst to the customer, the government or the pharmacy (until Relator conducted this analysis), Cigna and/or Optum imposed a clawback of $5.20.  As a result, UHC and Optum submitted to ADAP a

request for payment of $8.00, for a drug that cost $1.07, without disclosing that UHC and/or Optum were collecting a clawback of $5.20.

        ii.      On May 8, 2015, a customer at Relator's pharmacy sought to fill a prescription for Lorazepam 0.5 MG. The drug had a net cost of $3.48. Cigna (as the customer's primary insurer) and/or Optum (as the PBM) required a $20.00 co-pay. Because the transaction was eligible for ADAP co-pay assistance, UHC and/or Optum instantaneously adjudicated the transaction such that the ADAP paid the $20.00 co-pay. However, unbeknownst to the customer, the government or the pharmacy (until Relator conducted this analysis), Cigna and/or Optum imposed a clawback of $17.13.  As a result, UHC and Optum submitted to ADAP a request for payment of $20.00, for a drug that cost $3.48, without disclosing that UHC and/or Optum were collecting a clawback of $17.13.

        iii.     On September 21, 2016, a customer at Relator's pharmacy sought to fill a prescription for Losartan 25 MG. The drug had a net cost of $1.15. Cigna (as the customer's primary insurer) and/or Optum (as the PBM) required a $9.06 co-pay. Because the transaction was eligible for ADAP co-pay assistance, UHC and/or Optum instantaneously adjudicated the transaction such that the ADAP paid the $9.06 co-pay. However, unbeknownst to the customer, the government or the pharmacy (until Relator conducted this analysis), Cigna and/or Optum imposed a clawback of $6.85.  As a result, UHC and Optum submitted to ADAP a request for payment of $9.06, for a drug that cost $1.15, without disclosing that UHC and/or Optum were collecting a clawback of $6.85.

        iv.     On May 23, 2017, a customer at Relator's pharmacy sought to fill a prescription for Topiramate 100 MG. The drug had a net cost of $2.82. Cigna (as the customer's primary insurer) and/or Optum (as the PBM) required a $15.00 co-pay. Because the transaction was eligible for ADAP co-pay assistance, UHC and/or Optum instantaneously adjudicated the

transaction such that the ADAP paid the $15.00 co-pay. However, unbeknownst to the customer, the government or the pharmacy (until Relator conducted this analysis), Cigna and/or Optum imposed a clawback of $10.34.  As a result, UHC and Optum submitted to ADAP a request for payment of $15.00, for a drug that cost $2.82, without disclosing that UHC and/or Optum were collecting a clawback of $10.34.

        v.      On April 18, 2018, a customer at Relator's pharmacy sought to fill a prescription for Lamotrigine 25 MG. The drug had a net cost of $1.80. Cigna (as the customer's primary insurer) and/or Optum (as the PBM) required a $24.00 co-pay. Because the transaction was eligible for ADAP co-pay assistance, UHC and/or Optum instantaneously adjudicated the transaction such that the ADAP paid the $24.00 co-pay. However, unbeknownst to the customer, the government or the pharmacy (until Relator conducted this analysis), Cigna and/or Optum imposed a clawback of $21.50.  As a result, UHC and Optum submitted to ADAP a request for payment of $24.00, for a drug that cost $1.80, without disclosing that UHC and/or Optum were collecting a clawback of $21.50.

89.     In all, Relator's analysis identified 158 UHC-related transactions (i.e., transactions wherein UHC served as the insurer) and 316 Cigna-related transactions (i.e., transactions wherein Cigna served as the insurer) during which Defendants imposed a secret clawback in connection with a Program-covered prescription. Relator also identified transactions involving Innoviant and PacifiCare (both of which are owned by UHG) in which clawbacks on Program-covered prescriptions were also imposed.

90.     All of these actual transactions were fraudulent because the undisclosed clawbacks were not reasonable Administrative Fees.  They involved the submission of a false and misleading claim submitted to the government for which Program funds were sought and

obtained.  These actual Program-covered transactions are illustrative of numerous other similarly-false and misleading Program-covered transactions that Defendants submit nationwide.

91.    Defendants have caused the Program to overpay for Program-covered drugs by causing the government to pay when no payment was warranted or by causing the government to pay in amounts above what the government should have paid.  As detailed in the above examples, Defendants have caused the government to pay more than the "best price" for such drugs and more than the "administrative fee" to which they were entitled. In many instances, Defendants have caused participating pharmacies to pay the full cost of the medication thus leaving no end payer obligation and negating any requirement by any other party or insurer to pay any further amounts.  Despite the fact that no claim for additional insurance payment exists or should be filed, Defendants nevertheless fraudulently billed the government for excessive payments in connection with such Program-covered drug purchases. As a result of this scheme, the government has been damaged by overpaying for Program-covered pharmaceuticals.

92.    Additionally, the Pharmacy Network Agreement between OptumRx, Inc., and Pharmacy Providers of Oklahoma (where Relator serves as Pharmacy Manager) that governs the relationship between Optum and Relator's pharmacy does not provide for any compensation to be paid by Relator's pharmacy to Optum.[4]

93.    Finally, in addition to identifying Program-covered pharmaceuticals for which the government provided co-pay assistance, Relator also identified several instances in which the government provided premium-assistance for Program-covered patients.  That is, the government helped Program-covered patients pay for their medical insurance premiums (in addition to their

---

[4]    While the agreement does list certain possible "Claims Processor Charges" that may be owed by the pharmacy or other third parties, such amounts are primarily transmittal charges owed for specific events, including the use of an on-line electronic claims processing system, surcharges for cancelled or reversed claims, requests for additional material, or transactions processed in non-NCPDP format.

co-pay). For example, during the same period described above (January 1, 2014 and September 25, 2018) Relator identified the following:

       i.      With regards to UHC, of the 158 clawback-tainted transactions, six Program-covered individuals (representing 58 separate transactions) received premium–assistance from the Program; and,

       ii.      With regards to Cigna, of the 316 clawback-tainted transactions, six Program-covered individuals (representing 183 separate transactions) received premium-assistance from the Program.

94.     As a result, the government not only paid for some or all of the cost of obtaining drug coverage insurance for Program-covered patients, but was then overcharged by the very insurance the government helped those patients obtain.

95.     Accordingly, the excessive drug prescription charges that Defendants have submitted to and collected from the government, including the secret clawbacks, were false and caused the government substantial injury.

## COUNT I

### FEDERAL FALSE CLAIMS ACT
**31 U.S.C. §3729(a)(1)[1986] and**
**31 U.S.C. §3729(a)(1)(A)[2009]**

96.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

97.     Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval in violation of 31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009].

98.     By virtue of the false or fraudulent claims that Defendants presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT II

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(2)[1986] and
### 31 U.S.C. § 3729(a)(1)(B)[2009]

99.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

100.    Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(2) [1986].  Defendants' false records or statements caused the Plaintiff States to submit false and inflated claims to the United States for the federal portion of Medicaid.

101.    Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government.  Defendants' false records or statements caused the Plaintiff States to submit false and inflated claims to the United States for the federal portion of Medicaid in violation of 31 U.S.C. §3729(a)(1)(B)[2009].

102.    By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT III

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(3)[1986] and
### 31 U.S.C. §3729(a)(1)(C)[2009]

103.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

104.    Through these acts, and further as set forth in Counts I and II, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the United States has suffered actual damages.

## COUNT IV

### THE CALIFORNIA FALSE CLAIMS ACT (the "Act"),
### CALIFORNIA GOVERNMENT CODE §§ 12651, et seq.

105.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein, including but not limited to evidence that shows Defendants violated California Business and Professions Code §650, California Welfare and Institutions Code §14107.2, and the California Code of Regulations Title 22 §51501(a).

106.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 12651(a)(1) of the Act.  Such claims caused actual damages to the State.

107.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 12651(a)(2) of the Act.  Such claims caused actual damages to the State.

108.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT V

### CONNECTICUT FALSE CLAIMS ACT
### FOR PUBLIC ASSISTANCE PROGRAMS (the "Act")
### CONN. GEN. STAT. § 17b-301 et seq.

109.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

110.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 17b-301b(1) of the Act.  Such claims caused actual damages to the State.

111.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 17b-301b(2) of the Act.  Such claims caused actual damages to the State.

112.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT VI

### THE DELAWARE FALSE CLAIMS AND REPORTING ACT (the "Act"), DEL. CODE ANN. TIT. 6, § 1201 et seq.

113.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

114.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 1201(a)(1) of the Act.  Such claims caused actual damages to the State.

115.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 1201(a)(2) of the Act.  Such claims caused actual damages to the State.

116.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT VII

### THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT (the "Act"), D.C. CODE ANN. §§ 2-308.14 et seq.

117.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

118.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the District of Columbia in violation of Section 308.14(a)(1) of the Act.  Such claims caused actual damages to the State.

119.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 308.14(a)(2) of the Act.  Such claims caused actual damages to the State.

120.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT VIII

### THE FLORIDA FALSE CLAIMS ACT (the "Act"), FLA. STAT. §§ 68.082(2) et seq.

121.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

122.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 68.082(2)(a) of the Act.  Such claims caused actual damages to the State.

123.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 68.082(2)(a) of the Act.  Such claims caused actual damages to the State.

124.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT IX

### GEORGIA FALSE MEDICAID CLAIMS ACT (the "Act")
### GA. CODE ANN. §49-4-168.1 et seq.

125.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

126.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 49-4-168.1(a)(1) of the Act.  Such claims caused actual damages to the State.

127.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 49-4-168.1(a)(2) of the Act.  Such claims caused actual damages to the State.

128.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT X

### HAWAII FALSE CLAIMS ACT (the "Act")
### HAW. REV. STAT. §661-21 et seq.

129.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

130.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 661-21(a)(1) of the Act.  Such claims caused actual damages to the State.

131.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 661-21(a)(2) of the Act.  Such claims caused actual damages to the State.

132.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XI

### THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT (the "Act"), 740 ILL. COMP. STAT. ANN. §§ 175/3 et seq.

133.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

134.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 175/3(a)(1) of the Act.  Such claims caused actual damages to the State.

135.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 175/3(a)(2) of the Act.  Such claims caused actual damages to the State.

136.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XII

**THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER
PROTECTION ACT (the "Act"), INDIANA CODE 5-11-5.5-2 et seq.**

137.    Relator re-alleges and incorporates by reference each and every allegation
contained in the paragraphs above as though fully set forth herein.

138.    Through these acts, the Defendants have knowingly presented or caused to be
presented false or fraudulent claims for payment to the State in violation of Section 5-11-5.5-
2(b)(2), of the Act.  Such claims caused actual damages to the State.

139.    Through these acts, the Defendants knowingly made, used, or caused to be made
or used false records or statements material to a false or fraudulent claim to the State, in violation
of Section 5-11-5.5-2(b)(8), of the Act.  Such claims caused actual damages to the State.

140.    Through these acts, and further as set forth in the preceding three paragraphs,
Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has
suffered actual damages.

## <u>COUNT XIII</u>

**LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW (the "Act")
LA. REV. STAT. § 46:438.3 et seq.**

141.    Relator re-alleges and incorporates by reference each and every allegation
contained in the paragraphs above as though fully set forth herein.

142.    Through these acts, the Defendants have knowingly presented or caused to be
presented false or fraudulent claims for payment to the State in violation of Section 46:438.3(A)
of the Act.  Such claims caused actual damages to the State.

143.    Through these acts, the Defendants have knowingly presented or caused to be
presented false or fraudulent claims for payment to the State in violation of Section 46:438.3(B)
of the Act.  Such claims caused actual damages to the State.

144.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XIV

### THE MARYLAND FALSE HEALTH CLAIMS ACT (THE "ACT")
### MD.   CODE ANN., HEALTH-GEN §§2-602 et seq.

145.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

146.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 2-602(A)(1), of the Act.  Such claims caused actual damages to the State.

147.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 2-602(A)(2), of the Act.  Such claims caused actual damages to the State.

148.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XV

### THE MASSACHUSETTS FALSE CLAIMS ACT (the "Act"),
### MASS. ANN.  LAWS. CH. 12, §§ 5B et seq.

149.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

150.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5B(1), of the Act.  Such claims caused actual damages to the State.

151.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section  5B(2), of the Act.  Such claims caused actual damages to the State.

152.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XVI

### MICHIGAN MEDICAID FALSE CLAIMS ACT (the "Act"), MCLS §§ 400.607 et seq.

153.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

154.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 400.607(1), of the Act.  Such claims caused actual damages to the State.

155.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 400.607(3), of the Act.  Such claims caused actual damages to the State.

156.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XVII

### MINNESOTA FALSE CLAIMS ACT (the "Act"), MINN. STAT. §15C.02 et seq.

157.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

158.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 15C.02(a)(1), of the Act.  Such claims caused actual damages to the State.

159.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 15C.01(a)(2), of the Act.  Such claims caused actual damages to the State.

160.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XVIII

### MONTANA FALSE CLAIMS ACT
### MONT. CODE ANN. 17-8-403(1) et seq.

161.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

162.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 17-8-403(1)(a), of the Act.  Such claims caused actual damages to the State.

163.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section  17-8-403(1)(b) of the Act.  Such claims caused actual damages to the State.

164.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

<u>COUNT XIX</u>

**THE NEVADA SUBMISSION OF FALSE CLAIMS
TO STATE OR LOCAL GOVERNMENT ACT (the "Act"),
NEV. REV. STAT. §§ 357.040 et seq.**

165.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

166.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 357.040(1)(a), of the Act.  Such claims caused actual damages to the State.

167.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 357.040(1)(b), of the Act.  Such claims caused actual damages to the State.

168.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

<u>COUNT XX</u>

**NEW HAMPSHIRE FALSE CLAIMS ACT (the "Act")
N.H. REV. STAT. ANN. §167:61-b et seq.**

169.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

170.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 167:61-b(I)(a), of the Act.  Such claims caused actual damages to the State.

171.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 167:61-b(I)(b), of the Act.  Such claims caused actual damages to the State.

172.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXI

### NEW JERSEY FALSE CLAIMS ACT (the "Act")
### N.J. STAT. §2A:32C-3 et seq.

173.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

174.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 2A:32C-3(a), of the Act.  Such claims caused actual damages to the State.

175.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false  records or statements material to a false or fraudulent claim to the State, in violation of Section 2A:32C-3(b), of the Act.  Such claims caused actual damages to the State.

176.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXII

### THE NEW MEXICO MEDICAID FALSE CLAIMS ACTN.M.
### STAT. ANN. § 27-14-4A et seq.

177.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

178.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 27-14-A(1), of the Act.  Such claims caused actual damages to the State.

179.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section  27-14-4A(2), of the Act.  Such claims caused actual damages to the State.

180.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXIII

### THE NEW YORK FALSE CLAIMS ACT (the "Act"), NY CLS ST. FIN. § 189 et seq.

181.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

182.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 189(1)(a), of the Act.  Such claims caused actual damages to the State.

183.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 189(1)(b), of the Act.  Such claims caused actual damages to the State.

184.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXIV

## NORTH CAROLINA FALSE CLAIMS ACT (the "Act")
## N.C. GEN. STAT. §1-607(A) et seq.

185.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

186.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 1-607(A)(1), of the Act.  Such claims caused actual damages to the State.

187.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 1-607(A)(2), of the Act.  Such claims caused actual damages to the State.

188.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXV

## OKLAHOMA MEDICAID FALSE CLAIMS ACT (the "Act")
## OKLA. STAT. TIT. 63, §5053.1B et seq.

189.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

190.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5053.1B(1), of the Act.  Such claims caused actual damages to the State.

191.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 5053.1B(2), of the Act.  Such claims caused actual damages to the State.

192.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXVI

### RHODE ISLAND FALSE CLAIMS ACT (the "Act")
### R.I. GEN. LAWS §9-1.1-3 et seq.

193.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

194.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 9-1.1-3(a)(1), of the Act.  Such claims caused actual damages to the State.

195.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 9-1.1-3(a)(2), of the Act.  Such claims caused actual damages to the State.

196.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXVII

### THE TENNESSEE MEDICAID FALSE CLAIMS ACT (the "Act"),
### TENN. CODE ANN. §§ 71-5-182(a) et seq.

197.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

48

198.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 71-5-182(a)(1)(A), of the Act.  Such claims caused actual damages to the State.

199.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 71-5-182(a)(1)(B), of the Act.  Such claims caused actual damages to the State.

200.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXVIII

### TEXAS MEDICAID FRAUD PREVENTION ACT
### TEX. HUM. RES. CODE ANN. §36.002 ET SEQ.

201.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

202.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 36.002(1), of the Act.  Such claims caused actual damages to the State.

203.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 36.002(4), of the Act.  Such claims caused actual damages to the State.

204.     Through these acts, Defendant knowingly made a claim for a product that has been adulterated, debased, mislabeled or that is otherwise inappropriate in violation of Section 36.002(7).  Such claims caused actual damages to the State.

205.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXIX

### THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT (the "Act"), VA. CODE §§ 8.01-216.3A ET SEQ.

206.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

207.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 8.01-216.3A(1), of the Act.  Such claims caused actual damages to the State.

208.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 8.01-216.3A(2), of the Act.  Such claims caused actual damages to the State.

209.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXX

### WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT (the "Act") WIS. STAT. §20.931(2) ET SEQ.[5]

210.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

---

[5] The Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§ 20.931, *et seq*. was repealed effective July 15, 2015.  Relator seeks only false claims resulting from Defendants' conduct alleged herein to those false claims prior to this date.

211.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 20.931(2)(a), of the Act.  Such claims caused actual damages to the State.

212.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 20.931(2)(b), of the Act.  Such claims caused actual damages to the State.

213.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

## COUNT XXXI

## COLORADO MEDICAID FALSE CLAIMS ACT (the "Act")
## Colorado Stat. §§25.5-4-304 - 25.5-4-310

214.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

215.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section   §§25.5-4-304 - 25.5-4-310), of the Act.  Such claims caused actual damages to the State.

216.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section §§25.5-4-304 - 25.5-4-310of the Act.  Such claims caused actual damages to the State.

217.    Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

<u>**COUNT XXXII**</u>

<u>**ALASKA MEDICAL ASSISTANCE FALSE CLAIMS REPORTING ACT (the "Act")**</u>
<u>**Ak Stat § 09.58.010 et seq. (2016)**</u>

218.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

219.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section  § 09.58.010 of the Act.  Such claims caused actual damages to the State.

220.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section § 09.58.010  of the Act.  Such claims caused actual damages to the State.

221.     Through these acts, and further as set forth in the preceding three paragraphs, Defendants conspired to commit violations of the Act.  By virtue of this conspiracy, the State has suffered actual damages.

<u>**DEMAND FOR JURY TRIAL**</u>

222.     A jury trial is demanded in this case.

<u>**REQUESTS FOR RELIEF**</u>

WHEREFORE, Relator, on behalf of the United States and the Plaintiff States, demands that judgment be entered in their favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

This Request also includes, with respect to the state statutes cited above, the maximum damages permitted by those statutes and the maximum fine or penalty permitted by those statutes, and any other recoveries or relief provided for under the State FCA's.

Further, Relator requests that they receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the Plaintiff States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that this award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

Dated: February 6, 2019

/s/ William B. Federman
William B. Federman (Bar No. 2853)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, Oklahoma 73120
Telephone: (405) 235-1560
Fax: (405) 239-2112
wbf@federmanlaw.com

Robert A. Izard
Craig A. Raabe
Christopher M. Barrett
**IZARD, KINDALL & RAABE, LLP**
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
rizard@ikrlaw.com
craabe@ikrlaw.com
cbarrett@ikrlaw.com

William H. Narwold
Mathew Jasinski
**MOTLEY RICE LLC**
One Corporate Center
20 Church Street, Floor 17
Hartford, CT 06103
Telephone: (860) 882-1676
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Ronen Sarraf
Joseph Gentile
**SARRAF GENTILE LLP**
10 Bond Street, Suite 212
Great Neck, New York 11021
Telephone: (516) 699-8890
ronen@sarrafgentile.com
joseph@sarrafgentile.com